IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

INSTITUTE FOR REFORMING GOVERNMENT INC.,

Plaintiff,

v. Case No. 2025-CV-1384

MARY BETH KEPPEL, DONALD A. DAUGHERTY, JR., ANALISE EICHER, ROBERTA GASSMAN, JOHN T. HENDRICKS, THOMAS HRUZ, RHONDA LANFORD, BARBARA NOTESTEIN in their official capacities as members of the Wisconsin Judicial Commission,

Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION AND IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION**

---

JOSHUA L. KAUL
Attorney General of Wisconsin

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

FAYE B. HIPSMAN
Assistant Attorney General
State Bar #1123933

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636 (CTR)
(608) 264-9487 (FBH)
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov
faye.hipsman@wisdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION .......... 4

STATEMENT OF THE CASE .......... 5

I. The Wisconsin Judicial Commission's work is confidential up until it files a public complaint accusing a judge of misconduct. .......... 5

A. The Commission investigates alleged judicial misconduct. .......... 6

B. The Commission's work is largely confidential. .......... 6

C. Similar confidentiality provisions are ubiquitous nationwide .......... 7

II. The Commission dismissed a request for investigation from the Institute for Reforming Government, which then filed this action. .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 9

I. The confidentiality provisions aren't invalid under the First Amendment, either facially or as applied here. .......... 9

A. Preserving confidentiality in the judicial discipline process serves compelling state interests. .......... 10

1. Confidentiality protects the judiciary. .......... 10

2. Confidentiality helps judicial discipline to function. .......... 14

3. IRG incorrectly rejects these compelling state interests. .......... 16

a. *Landmark* involved criminally punishing nonparticipants to disciplinary proceedings. .......... 17

b. Wisconsin's Confidentiality Provisions don't criminally punish nonparticipants. .......... 20

B. The Confidentiality Provisions are narrowly tailored to serve these compelling state interests. ..... 22

1. The underlying facts can be publicly discussed. ..... 23

2. There aren't any criminal or monetary penalties here. ..... 24

3. There aren't any penalties for third parties. ..... 25

4. Confidentiality ends upon a finding of probable cause. ..... 26

5. IRG's proposed alternatives wouldn't work. ..... 29

C. Any unconstitutional applications of the Confidentiality Provisions can and must be severed. ..... 30

II. The Confidentiality Provisions aren't unconstitutionally vague ..... 31

CONCLUSION ..... 33

## INTRODUCTION

Rarely do virtually all 50 states and the federal government agree on anything, which makes the near-universal consensus around confidentiality in the judicial disciplinary process even more remarkable. Practically all jurisdictions recognize that a judicial disciplinary system is essential to ensure an ethical and effective judiciary. And practically all those jurisdictions recognize that confidentiality is essential to that disciplinary process. Without confidentiality, the reputations of individual judges and the entire judiciary would suffer from publicly weaponized complaints, especially from the vast quantity that are later found to be meritless. Equally important, a public process would make it very hard for disciplinary commissions to do their jobs, since confidentiality encourages witnesses—who often work closely with the target judge—to cooperate with investigations. That's why Wisconsin, like virtually everyone else, protects the confidentiality of judicial disciplinary proceedings, at least until charges are found to have some merit.

The Institute for Reforming Government ("IRG"), an advocacy group that complained about a judge to the Wisconsin Judicial Commission, overstates the impact of Wisconsin's confidentiality provisions. The only thing IRG can't do is disclose information related to the Commission's proceedings, such as the fact that it filed a complaint against an identified judge with the Commission. But IRG can publicly accuse that judge of the exact same misconduct described in its complaint and, in fact, the group's staff did so here. And the provisions allow for only minimal consequences when complainants breach confidentiality; their complaint might be dismissed along with a strongly worded letter from the Commission. That's nothing

like IRG's featured case, *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978), which turned on how a much stricter provision criminally penalized a newspaper that wasn't even participating in disciplinary proceedings. Wisconsin's narrower, more lenient provision properly balances IRG's right to criticize judges with the State's interest in an ethical judiciary and an effective disciplinary process.

At the very least, Wisconsin's confidentiality provisions shouldn't be facially invalidated, as IRG requests. IRG practically concedes (and the amicus here agrees) that the provisions serve compelling interests by protecting ongoing Commission investigations and internal Commission deliberations. Whatever comes of the main dispute over confidentiality *after* the Commission dismisses a complaint, severability requires saving the provisions' many valid applications. Any broader remedy would unnecessarily threaten the reputation of Wisconsin's judiciary and make the Commission's job of investigating alleged misconduct virtually impracticable.

## STATEMENT OF THE CASE

### I. The Wisconsin Judicial Commission's work is confidential up until it files a public complaint accusing a judge of misconduct.

The Wisconsin Judicial Commission is an independent agency that investigates and prosecutes allegations of misconduct by Wisconsin's state court judges. *See generally* Wis. Stat. § 757.83. The Commission's mission is to preserve the integrity of the Wisconsin judiciary by holding judicial officials accountable for violations of the Wisconsin Code of Judicial Conduct and thus to uphold public trust in the courts. *See* Wis. Stat. § 757.83–95; (*see also* Dkt. 29-4:4 (2025 Commission report)). Confidentiality is a major part of how the Commission does its job.

### A. The Commission investigates alleged judicial misconduct.

Any person may file a complaint alleging misconduct by a judge to the Commission. Wis. Admin. Code JC § 4.01. If the Commission's executive director finds cause justifying further review, the Commission determines whether to authorize an investigation. Wis. Admin. Code JC § 4.02. If the Commission does so, Commission staff conduct a "full, fair, and prompt investigation." Wis. Admin. Code JC § 4.03(1). Such investigations frequently entail interviewing witnesses, usually including litigants with cases before the judicial official who is the subject of the investigation, attorneys who frequently appear before that judicial official, court staff members who work with that judicial official and whose positions are often under the judicial official's direction and control, judicial colleagues, and other stakeholders in the local justice system where the judicial official serves. (Van Hecke Decl. ¶ 7.)

At the conclusion of its investigation, the Commission may dismiss the allegation, find that probable cause exists, or take other action as warranted. *See* Wis. Admin. Code JC §§ 4.05–4.08; (Van Hecke Decl. ¶ 9). If the Commission finds probable cause of misconduct, it must file a formal complaint and prosecute a public action against the judicial official in the Wisconsin Supreme Court. *See* Wis. Stat. § 757.85; Wis. Admin. Code JC § 4.08(6).

### B. The Commission's work is largely confidential.

The Commission's investigative work is protected by two confidentiality provisions (collectively, the "Confidentiality Provisions"). First, by enacting Wis. Stat. § 757.93(1)(a), Wisconsin's legislature provided that Commission proceedings are confidential prior to a formal complaint's filing with the Wisconsin Supreme Court:

> All proceedings . . . relating to misconduct or permanent disability prior to the filing of a petition or formal complaint by the commission are confidential unless a judge or circuit or supplemental court commissioner waives the right to confidentiality in writing to the commission.

Wis. Stat. § 757.93(1)(a). Once such a complaint is filed, proceedings become public; if such a complaint isn't filed, the confidentiality provision applies in perpetuity. The administrative code contains a parallel provision that may subject complainants who breach confidentiality to limited administrative consequences:

> If a person who makes an allegation under s. JC 4.01 or 5.01, breaches the confidentiality of the investigation, the commission may dismiss the allegation, admonish the person or take other appropriate action.

Wis. Admin. Code JC § 3.01. No other consequences are specified elsewhere.

### C. Similar confidentiality provisions are ubiquitous nationwide.

Confidential disciplinary processes like Wisconsin's were driven by a "recognition that . . . traditional methods" of judicial discipline—primarily impeachment—"are cumbersome and ineffective, partly because of their openness." *First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 473 (3d Cir. 1986). That helps explain why "[a]ll 50 states, as well as the Federal Government, recognize the importance of keeping these investigation records confidential, and thus have similar privileges protecting the confidentiality of judicial investigation records." *Clemmer v. Off. of Chief Judge*, 544 F. Supp. 2d 722, 728 (N.D. Ill. 2008).

The federal judicial disciplinary system, established by 28 U.S.C. 351–64, has a virtually identical confidentiality provision. Under 28 U.S.C. § 360, "all papers, documents, and records of proceedings related to investigations conducted under this chapter shall be confidential and shall not be disclosed by any person in any

proceeding," unless, among other things, the investigating body recommends impeachment to the House of Representatives. So, federal disciplinary proceedings "short of impeachment, have been subject to nearly total confidentiality." *Adams v. Comm. on Jud. Conduct & Disability*, 165 F. Supp. 3d 911, 928 (N.D. Cal. 2016).

This policy is consistent with other states. At least as of 1994, "[e]very jurisdiction protect[ed] preliminary investigations from public access." Bryan E. Keyt, *Reconciling the Need for Confidentiality in Judicial Disciplinary Proceedings with the First Amendment: A Justification Based Analysis*, 7 Geo. J. Legal Ethics 959, 961 (1994). Even today in most states, confidentiality lifts only when formal charges are filed.[1] And the American Bar Association's Model Rules for Judicial Disciplinary Enforcement (co-authored by Judge Barbara B. Crabb) also concur. They provide that "[b]efore the filing and service of formal charges, all proceedings shall be confidential," and that "[a]fter the filing and service of formal charges, all proceedings shall be public except incapacity proceedings." ABA Model Rules for Judicial Disciplinary Enforcement R. 11 (2018).[2]

## II. The Commission dismissed a request for investigation from the Institute for Reforming Government, which then filed this action.

The Institute for Reforming Government ("IRG") filed a request for investigation with the Commission alleging misconduct by a judicial official. (Dkt. 29-

[1] *See* Ctr. For Jud. Ethics, *Judicial Ethics Governance*, Nat'l Ctr. for State Cts., https://www.ncsc.org/resources-courts/judicial-ethics-governance ("Confidentiality of Proceedings" tab) (last visited Sept. 30, 2026).

[2] *Model Rules for Judicial Disciplinary Enforcement*, Am. Bar Ass'n (Aug. 13, 2018), https://www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/rule11/.

3 ¶ 13.) The Commission ultimately dismissed the Institute's request for investigation, finding that it didn't "warrant further action or consideration by the Commission." (Dkt. 29-3:7.) The Commission also informed IRG that "this matter has been closed and Commission proceedings relating to it remain strictly confidential pursuant to state law." (Dkt. 29-3:7.)

IRG then brought this action challenging the Confidentiality Provisions under the First Amendment. (Dkt. 1:10–14.) IRG alleges that the Confidentiality Provisions are both facially invalid and invalid as applied to it here. (Dkt. 1:14.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cases "where the parties agree that there are no genuine issues of material fact in dispute and that the contested issues are purely legal ones[ ] are especially appropriate for summary judgment." *Amax Coal Co. v. United Mine Workers of Am.*, 92 F.3d 571, 575 (7th Cir. 1996).

## ARGUMENT

### I. The confidentiality provisions aren't invalid under the First Amendment, either facially or as applied here.

The Commission doesn't contest that the Confidentiality Provisions represent content-based speech restrictions that trigger strict scrutiny under the First Amendment. (*Cf.* Dkt. 29-1:9–10.) But they survive that scrutiny because, without confidentiality, the Commission couldn't do its job of ensuring a qualified, ethical state judiciary. That's a quintessential compelling state interest, and the

Confidentiality Provisions—which allow complainants to publicly discuss underlying allegations of judicial misconduct, contain no criminal or civil penalties, impose no penalties on nonparticipants, and end upon the filing of a formal complaint—are narrowly tailored to serve it.

### A. Preserving confidentiality in the judicial discipline process serves compelling state interests.

In the "collective judgment" of virtually every jurisdiction in the United States, confidentiality in the judicial discipline serves the compelling state interest in "[e]nsur[ing] the ultimate effectiveness" of the judicial disciplinary process. *Landmark*, 435 U.S. at 835–36. As Justice Stewart[3] put it, "[t]here could hardly be a higher governmental interest" than in the "quality of [a state's] judiciary," and it's "clear" that "maintaining the confidentiality of [disciplinary] proceedings" advances that interest. *Id.* at 848 (Stewart, J., concurring); *see also Kamasinski v. Jud. Rev. Council*, 44 F.3d 106, 110 (2d Cir. 1994) ("The state's interest in the quality of its judiciary . . . is an interest of the highest order."); (Dkt. 33-1:11–20 (amicus agreeing)).

Confidentiality serves this interest in two main ways. First, it protects the judiciary itself. Second, it helps judicial disciplinary bodies do their jobs effectively.

#### 1. Confidentiality protects the judiciary.

Confidentiality during disciplinary processes protects judges in several ways.

[3] Justice Stewart was no enemy of the First Amendment. *See, e.g.*, *Edwards v. South Carolina*, 372 U.S. 229 (1963) (affirming anti-segregationists' protest rights); *Branzburg v. Hayes*, 408 U.S. 665 (1972) (Stewart, J., dissenting) (arguing for heightened showing before reporters can be forced to testify before grand juries).

First, confidentiality protects individual judges "from the injury which might result from publication of unexamined and unwarranted complaints." *Landmark*, 435 U.S. at 835.[4] Congress recognized this problem when it provided for confidentiality in the federal disciplinary system. *See* S. Rep. No. 96-362 (1980), reprinted in 1980 U.S.C.C.A.N. 4315, 4330 (the "Senate Report") ("[T]he establishment of a confidentiality provision will avoid possible premature injury to the reputation of a judge" that may arise through "malicious publicity."). So too has the American Bar Association, which emphasizes "judges' interest in the confidentiality of complaints for which the commission finds there is not reasonable cause to believe that misconduct occurred."[5] Such complaints can be especially difficult for judges to defend against, given how they "lack the freedom to defend themselves publicly against all meritless complaints." *Smith v. Tarr*, No. 13-1230, 2015 WL 148680, at *5 (W. Va. Jan. 12, 2015). To be clear, the problem is not that judges will be publicly accused of misconduct. Rather, the risk is that complainants will leverage the disciplinary body's apparent imprimatur through public statements like, "The Judicial Commission is looking into a complaint I filed against Judge X."[6] Such statements imply a heightened seriousness to the allegations that they might not (and often do not) merit.

---

[4] *See also First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 473 (3d Cir. 1986) (recognizing this interest); *Adams v. Comm. on Jud. Conduct & Disability*, 165 F. Supp. 3d 911, 929 (N.D. Cal. 2016) (same); *Kamasinski v. Jud. Rev. Council*, 44 F.3d 106, 110 (2d Cir. 1994) (same); *Garner v. Cherberg*, 765 P.2d 1284, 1288 (Wash. 1988) (same).

[5] *Model Rules for Judicial Disciplinary Enforcement*, Am. Bar Ass'n (Aug. 13, 2018), https://www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/preface/.

[6] *Cf. Justice Department Files Judicial Misconduct Complaint Alleging MN Judges Made Improper and Unethical Comments to the New York Times*, Office of Pub. Affairs

In Wisconsin, state judges' need for reputational protection against the disclosure of groundless complaints is clear. Between January 1, 2023, and December 31, 2025, the Commission received 2,125 initial inquiries alleging misconduct on the part of Wisconsin judges. Of those, it conducted preliminary evaluations of 112 requests for investigation, authorized 28 investigations, and found probable cause of misconduct in only two matters. (Van Hecke Decl. ¶ 13.) The sheer volume of initial inquiries, compared to the small number of determinations of probable cause, demonstrates the risk of reputational injury that Wisconsin's state judges would face absent confidentiality protections applied to Commission proceedings.

Second, and relatedly, protection from groundless claims of judicial misconduct maintains broader "confidence in the judiciary." *Landmark*, 435 U.S. at 835.[7] Nevada's high court put it well:

> By its very nature, the judiciary deals with disputes that often leave litigants or counsel with negative or agitated feelings. As a result, many complaints may be generated and sent to the Commission about judges that are entirely without merit. If all of these unfounded complaints were available to the public and the media, without any inquiry into their substance, public esteem for the judiciary as a whole would suffer, thus making it more difficult for the one branch of government that should be a safe haven for the impartial and fair resolution of disputes, to inspire public confidence in the integrity of judicial proceedings.

*Whitehead v. Nev. Comm'n on Jud. Discipline*, 893 P.2d 866, 888 (Nev. 1995) (citation omitted). Congress similarly observed the "importanc[e] that the American people continue to be confident in their federal judiciary" and that "the perception of a viable

---

(Sept. 30, 2026), https://www.justice.gov/opa/pr/justice-department-files-judicial-misconduct-complaint-alleging-mn-judges-made-improper-and.

[7] *See also First Amend. Coal.*, 784 F.2d at 475–76 (recognizing this interest); *Adams*, 165 F. Supp. 3d at 929 (same); *Kamasinski*, 44 F.3d at 110 (same).

healthy judiciary is of critical importance to our system of justice." Senate Report, 1980 U.S.C.C.A.N. at 4321. If any major chunk of the 2,123 recent initial inquiries that lacked probable cause were publicly disclosed, confidence in Wisconsin's judiciary would surely suffer.

Third, confidentiality serves to "attract[ ] qualified judges," especially in states (like Wisconsin) with an elected judiciary. *Kamasinski*, 44 F.3d at 110. Again, Nevada's high court explained the problem:

> Unless the Nevada judiciary is ultimately to be staffed only by those who are independently wealthy, most lawyers who sever ties to private practice or other sources of financial security would think twice about aspiring to an elected judiciary where, even after election, future opponents could cite to groundless Commission complaints as a basis for denying an incumbent reelection. . . . Thus, a negative campaign challenge could be mounted on inferences drawn solely from frivolous complaints to the Commission.

*Whitehead*, 893 P.2d at 888.

Wisconsin's experience bears this out. In recent years, the Commission has noted a marked increase in the number of complaints filed against judicial officials during their run for judicial office that are frivolous, unfounded, or do not justify a probable cause finding. (Van Hecke Decl. ¶ 13.) Several of those complaints have been publicly disclosed by complainants to serve their own interests, serve the interests of their preferred judicial candidate in the midst of a judicial election, or impede the interests of the judicial candidate that they oppose. (Van Hecke Decl. ¶ 13.) Examples include announcements of the filing or the Commission's consideration of such complaints in press releases, announcements in social media posts, unsolicited media

contacts, and attempts by a complainant to fundraise for themselves, based upon the publicly announced filing of a judicial ethics complaint. (Van Hecke Decl. ¶ 13.)

**2. Confidentiality helps judicial discipline to function.**

Confidentiality provisions are also crucial to the ability of judicial disciplinary bodies to do their jobs, which in turn improves the quality of state judiciaries.

First, confidentiality "encourage[s] the filing of complaints and the willing participation of relevant witnesses by providing protection against possible retaliation or recrimination." *Landmark*, 435 U.S. at 835.[8] The ABA also recognizes that it's in "the interest of the judges and the public in having judicial disciplinary complaints resolved promptly and accurately."[9] But a "common result" of publicly disclosing disciplinary proceedings "will be that witnesses otherwise willing to speak candidly will decline to do so, in the knowledge that the media and others will pursue them to inquire whether they have in fact testified." *Kamasinski*, 44 F.3d at 111 (citation omitted).

That's all true in Wisconsin too. Information, including witness accounts, that either corroborates the claims of judicial misconduct made by cooperating complainants and witnesses, or rebuts such claims, is essential to the Commission members' ability to make fair, informed, and just decisions for the benefit of the judiciary and the public. (Van Hecke Decl. ¶ 15.) But many witnesses interviewed by

---

[8] *See also Garner*, 765 P.2d at 1288 (without confidentiality, "witnesses or complainants might remain silent rather than inform the Commission of judicial transgression"); *First Amend. Coal.*, 784 F.2d at 473 (similar).

[9] *Model Rules for Judicial Disciplinary Enforcement*, Am. Bar Ass'n (Aug. 13, 2018), https://www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/preface/.

Commission staff, most of whom must have regular, continued interactions with the judicial official as a result of their employment or circumstances, express fear or concern to Commission staff that their cooperation might result in retaliation or negative professional repercussions and elect to have their identities remain confidential (at least until the filing of a formal complaint). (Van Hecke Decl. ¶ 8.) And this concern often remains, even after the Commission concludes its review of the allegations of judicial misconduct, and even if the Commission has elected to dismiss the matter without the filing of a public complaint. (Van Hecke Decl. ¶ 15.) Absent confidentiality, then, witnesses would be less likely to cooperate with the Commission. (Van Hecke Decl. ¶ 15.)

Second, "the threat of exposing the confidential deliberative process" of judicial disciplinary bodies would "stifle" their work and "subject [their] members to outside political pressures." *Garner v. Cherberg*, 765 P.2d 1284, 1288 (Wash. 1988). The Commission is composed of nine volunteers who heavily rely on the confidentiality of Commission proceedings to engage in robust, candid, and diligent discussions during their decision-making processes. (Van Hecke Decl ¶ 17.) Confidentiality protects the volunteer members of the Commission from outside pressures and influences as they make fair, independent, informed, and reasoned decisions concerning matters involving judicial officials and judicial ethics. (Van Hecke Decl ¶ 17.)

Third, "[w]hen removal or retirement is justified by the charges, judges are more likely to resign voluntarily or retire without the necessity of a formal proceeding if the publicity that would accompany such a proceeding can thereby be avoided."

*Landmark*, 435 U.S. at 835–36.[10] So, for instance, during Congress's consideration of a predecessor bill to the one enacting the federal system, it considered testimony that in California "two or three judges a year have either retired or resigned voluntarily, rather than . . . confront the particular charges," and the "important" factor in this dynamic was that cases "[were] closed without any public furor." *Id.* at 836 n.7 (citation omitted). Similarly, in Wisconsin, judicial officials have decided to resign from judicial office prior to the Commission's filing of a public complaint, and a motivating factor in that decision was likely the confidentiality of Commission proceedings. (Van Hecke Decl. ¶ 16.)

**3. IRG incorrectly rejects these compelling state interests.**

IRG primarily responds that *Landmark* forecloses all these state interests (Dkt. 29-1:10–12), but that flips the decision on its head. *Landmark* recognized that these interests are all legitimate, holding only that they can't justify *criminally* prohibiting *third parties* (like newspapers) from disclosing information they've learned about disciplinary proceedings. But the *Landmark* court did "not have before [it]" a "constitutional challenge to a State's power to keep the Commission's proceedings confidential or to punish *participants* for breach of this mandate." *Landmark*, 435 U.S. at 836 (emphasis added). In fact, *Landmark* suggested that these important interests could justify imposing confidentiality requirements on participants like IRG, as the Confidentiality Provisions do here.

[10] *See also Kamasinski*, 44 F.3d at 110 (same); *First Amend. Coal.*, 784 F.2d at 476 (same); *Comm'n on Jud. Performance v. Superior Ct.*, 67 Cal. Rptr. 3d 434, 436 (Cal. Ct. App. 2007) (same); *Garner*, 765 P.2d at 1288 (same).

**a. *Landmark* involved criminally punishing nonparticipants to disciplinary proceedings.**

*Landmark* arose from a newspaper that had been criminally convicted for publishing information about a "pending inquiry" by Virginia's judicial discipline commission. *Id.* at 831. No employee or reporter of the newspaper had participated in the proceedings, whether as a witness or otherwise. *Id.* at 832. Yet the newspaper somehow learned about the allegations and published an article disclosing the judge under investigation. *Id.* Because the commission's investigation was ongoing and it hadn't yet filed a formal complaint against the judge, Virginia's confidentiality provision applied. *Id.* The newspaper was prosecuted for the article, convicted, and assessed a fine. *Id.* at 831–32.

The Supreme Court described the question presented as whether Virginia could lawfully "subject persons, including newspapers, to criminal sanctions for divulging information regarding proceedings before a state judicial review commission . . . when such proceedings are declared confidential." *Id.* at 830. And so the Court's decision was "narrow and limited" to "criminal punishment of third persons who are strangers to the inquiry." *Id.* at 837. On that "narrow" issue, the state's proffered interests couldn't justify "enforc[ing] confidentiality by use of *criminal sanctions* against *nonparticipants*." *Id.* at 841 (emphasis added).

But the Court suggested that those same state interests could justify requiring confidentiality of participants in the disciplinary process. The Court noted, without criticism, how "47 states" (at the time) required confidentiality and how Congress was

considering a similar process for federal judges. *Id.* at 834.[11] One such state the Court referenced was Wisconsin, which had a similar confidentiality provision back then.[12] *Id.* at 848. These provisions (including Wisconsin's) represented a "collective judgment that confidentiality promotes the effectiveness of this mode of scrutinizing judicial conduct and integrity," through all the specific mechanisms discussed above. *Id.* at 836. The Court therefore "assumed . . . that confidentiality of Commission proceedings serves legitimate state interests." *Id.* at 841.

Notably, the Court contrasted Virginia's criminal penalties for nonparticipant disclosures with how "40 states . . . have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants," including Wisconsin. *Id.* at 834 n.5, 841. The Court underscored this contrast by favorably citing states that instead required participants to take an "oath of secrecy" enforceable by contempt proceedings (an even stricter approach than Wisconsin's). *Id.* at 841, 841 n.12. And the Court concluded that risks of reputational injury to judges under investigation "can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings," again citing confidentiality provisions that govern participants. *Id.* at 845, 845 n.13.

*Landmark* therefore draws an implicit line between what the First Amendment allows—noncriminal enforcement of confidentiality against

[11] *Landmark* was decided two years before Congress enacted the federal disciplinary system through the Judicial Conduct and Disability Act of 1980.

[12] (*See* Van Hecke Decl. Ex. A:8–10 (Item (A)21 of the Rules for the Implementation of the Code of Judicial Ethics; Rules 2.2. and 3.4. of the Judicial Commission Rules of Procedure).)

participants—and what it doesn't—criminal enforcement against nonparticipants. *Cf. Whitehead*, 893 P.2d at 896 (observing how *Landmark* "noted, with no indications of disapproval, that a number of states punish a breach of the confidentiality requirement by commission members or staff as contempt"). And, by lumping Wisconsin in with states that don't impose criminal penalties on nonparticipants, the Court strongly suggested that Wisconsin's confidentiality provisions fall on the right side of that line. At the very least, the Court cordoned off from its holding whether states could "punish participants for breach[ing]" confidentiality "mandate[s]." *Landmark,* 435 U.S. at 837.

Multiple cases after *Landmark* have also read the decision as endorsing how confidentiality serves compelling state interests and narrowly barring only criminal prosecutions of nonparticipants. *See Kamasinski*, 44 F.3d at 110 (noting how the "discussion of the issues that were raised in *Landmark* provides support for the [state's] position" favoring confidentiality); *First Amend. Coal.*, 784 F.2d at 475 (remarking that *Landmark* "listed four advantages of confidentiality"); *Adams*, 165 F. Supp. 3d at 929–30 (observing that *Landmark* doesn't "support[ ] the conclusion that a bar on disclosure, even after the conclusion of [disciplinary] proceedings, is constitutionally infirm"); *Clemmer*, 544 F. Supp. 2d at 726 (explaining that *Landmark* "identified a number of policy considerations demonstrating the importance of maintaining confidentiality in the effective operation of state judicial disciplinary commissions"); *Whitehead*, 893 P.2d at 886 (the "*Landmark* Court in no sense suggested that maintaining the confidentiality of judicial disciplinary

proceedings was unconstitutional"). Other observers have also recognized *Landmark*'s limited reach.[13]

#### b. Wisconsin's Confidentiality Provisions don't criminally punish nonparticipants.

*Landmark* doesn't, as IRG says, "control[ ] here" (Dkt. 29-1:12) because this case doesn't involve a confidentiality provision that threatens "criminal sanctions against nonparticipants" to Commission proceedings. *Landmark*, 435 U.S. at 841. The Confidentiality Provisions allow only non-criminal administrative consequences for confidentiality breaches, and only for complainants (not also nonparticipants). So, even if the interests *Landmark* addressed can't support stricter confidentiality provisions, they can and do support more lenient, narrower ones like Wisconsin's.

More specifically, IRG isn't like the newspaper that was prosecuted in *Landmark*. IRG isn't seeking to publish second-hand information it has learned about Commission proceedings. IRG is instead a participant in those proceedings—it voluntarily filed a complaint with the Commission and would presumably participate as a witness to substantiate its allegations. *Landmark* couldn't have been clearer that "[n]o issue as to" participants like IRG was presented by the case. *Id.* at 837 n.10. If anything, IRG is precisely the kind of participant that can be subject to "careful

[13] *See, e.g.*, Jeffrey D. McMahan, Jr., *Guarding the Guardians: Judges' Rights and Virginia's Judicial Inquiry and Review Commission*, 43 U. Rich. L. Rev. 473, 483 (2008) (explaining how *Landmark* held that "those parties not involved in a judicial misconduct proceeding are free to exercise their First Amendment rights in reporting those proceedings" but "declined to address whether Virginia could compel the silence of those involved in the [disciplinary] proceedings"); 1 Judicial Conduct and Ethics § 11.12[2] (6th ed. 2020) (noting how *Landmark* didn't "involve any constitutional challenge to a state's authority to keep the commission's proceeding confidential or to punish participants for breach of this prohibition").

internal procedures to protect the confidentiality of Commission proceedings" (rather than criminal penalties), as *Landmark* suggested. *Id.* at 841.

IRG also relies heavily on *Doe v. Gonzalez*, 723 F. Supp. 690 (S.D. Fla. 1988) *aff'd*, 886 F.2d 1323 (11th Cir. 1989), which, to be sure, invalidated a confidentiality provision that operated on participants. For starters, *Doe* also involved criminal penalties and it recognized that *Landmark* (contrary to IRG's assertion) didn't resolve whether states can validly apply confidentiality provisions to participants. *Id.* at 693.

And *Doe* wrongly extended *Landmark* as such, for reasons the Second Circuit observed in *Kamasinski*. For one, *Doe* ignored the possibility that "armed with the ability to make the fact of a complaint public, complainants will engage in a campaign of harassment" that could "lead to the loss of judicial independence as well as an overburdening of the [disciplinary commission] with frivolous complaints." *Kamasinski*, 44 F.3d at 111. Moreover, *Doe* failed to realize that a "common result of publication will be that witnesses otherwise willing to speak candidly will decline to do so, in the knowledge that the media and others will pursue them to inquire whether they have in fact testified." *Id.* (citation omitted). And *Doe* also ignored "the state's significant interest in encouraging infirm or incompetent judges to step down voluntarily, a likelihood that is greatly reduced after publication that complaints have been filed against them." *Id.*

And *Doe* was simply wrong in other ways. In minimizing the interest in protecting judges' reputations and public faith in the judiciary, *Doe* reasoned that these were the "very interests that were found insufficient" in *Landmark*. *Doe*, 723

F. Supp. at 694. But that's a non sequitur, given how *Landmark* repeatedly emphasized that those interests *didn't* suffice to criminally prosecute nonparties but indicated that they *did* suffice to maintain confidentiality against participants. And, yes, when complainants want to disclose, they've decided they don't need confidentiality, *id.*, but allowing them to do so—even after a complaint's been dismissed—still threatens to scare off witnesses who might fear recrimination for participating in publicly-known proceedings. (Van Hecke Decl. ¶¶ 8, 15.)

As for IRG's citation to *Butterworth v. Smith*, 494 U.S. 624 (1990), and *C.R. Corps v. LaSalle*, 184 F.4th 104 (2d Cir. 2026), those cases have little relevance here. (Dkt. 29-1:13–14.) *Butterworth* involved a prohibition on grand jury witnesses disclosing their testimony, and *C.R. Corps* involved attorney disciplinary proceedings. This case involves accusations against judges, which trigger a unique set of interests that aren't presented in those other contexts. Again, "[t]here could hardly be a higher governmental interest" than in the "quality of [a state's] judiciary." *Landmark*, 435 U.S. at 848 (Stewart, J., concurring).

### B. The Confidentiality Provisions are narrowly tailored to serve these compelling state interests.

Wisconsin's Confidentiality Provisions are narrowly tailored to these compelling state interests. As Justice Stewart correctly observed in *Landmark*, "[o]nly . . . confidentiality" in the judicial discipline process "will protect upright judges from unjustified harm and at the same time [e]nsure the full and fearless airing in Commission proceedings of every complaint of judicial misconduct." *Landmark*, 435 U.S. at 849 (Stewart, J., concurring). It's therefore "almost

universally accepted" that "the effectiveness of judicial disciplinary boards depends to a large extent on confidentiality." *First Amend. Coal.*, 784 F.2d at 473. And so much so that confidentiality might be the lynchpin of the entire judicial disciplinary system; "[i]t is quite uncertain whether the state would have chosen a judicial disciplinary program or have been able to implement one in the absence of the confidentiality provision." *Id.*

Even if other confidentiality provisions might be overbroad, Wisconsin's aren't for four reasons: (1) they don't cover underlying facts; (2) they don't impose criminal or monetary penalties; (3) they don't impose penalties on third parties; and (4) they have a narrow temporal scope, since they end upon a finding of probable cause.

**1. The underlying facts can be publicly discussed.**

One reason why the Confidentiality Provisions are narrowly tailored is they don't cover the underlying facts. That is, IRG (or any other complainant) remains free to publicly discuss the substance of its allegations against a judge. The only thing complainants like IRG *can't* do is disclose information regarding the disciplinary process itself, like the fact that they've filed a complaint with the Commission.

In multiple places, IRG suggests it can't publicly discuss its underlying allegations. (*E.g.* Dkt. 29-1:7 (IRG "cannot publicly criticize the judge's original conduct"); 29-1:10 ("[o]ne is legally barred from discussing . . . the allegations . . . of a Request for Investigation"); 29-1:11 (IRG "want[s] to make [its] allegations known to the public" and "discuss them openly"); 29-1:16 (suggesting IRG can't discuss its "substantive allegations"); 29-1:21 (asserting that provisions bar "discussion of the underlying allegations").) That's wrong. Only the Commission's "proceedings" are

confidential under Wis. Stat. § 757.93(1)(a), not the alleged facts regarding judicial misconduct underlying those proceedings. Indeed, the IRG staff member who submitted IRG's complaint to the Commission publicly accused the same judicial official of violating the Code of Judicial Conduct for the same conduct detailed in that complaint. (Van Hecke Decl. ¶ 18.)

Allowing public discussion of the alleged judicial misconduct critically limits a confidentiality provision, as *Kamasinski* recognized. It's true that the State may not "prohibit the disclosure of the substance of an individual's complaint or testimony," *Kamasinski*, 44 F.3d at 110, but the Confidentiality Provisions don't do so. A "different question is presented" by requiring confidentiality of "the fact that a complaint has been filed or that testimony has been given." *Id.* That distinct kind of disclosure risks all the harms discussed above, and a state can permissibly bar it.

**2. There aren't any criminal or monetary penalties here.**

The Confidentiality Provisions also are narrowly tailored because they don't threaten criminal or even monetary penalties. Wisconsin Stat. § 757.93(1)(a) itself contains no penalties whatsoever for confidentiality breaches. As for the Commission's corresponding regulation, Wis. Admin. Code JC § 3.01, it only allows the Commission to "dismiss [a complainant's] allegation," "admonish" the complainant, or "take other appropriate action" against the complainant. Since the Commission has no statutory authority to issue criminal or civil penalties (such as "monetary sanction[s]" (Dkt. 29-1:19)), this code provision limits the available consequences to Commission speech or the use of otherwise authorized procedural tools. *See Koschkee v. Taylor*, 2019 WI 76, ¶14, 387 Wis. 2d 552, 929 N.W.2d 600 (state

agencies have "only those powers that are expressly conferred or that are necessarily implied by the statutes under which they operate" (citation omitted)).

That's nowhere near *Landmark* or *Doe*, both of which involved criminal charges for whoever breached confidentiality. Again, *Landmark* strongly suggested the availability of criminal sanctions is a deciding factor, as it contrasted a "generalized mandate of confidentiality" (like the one here) with "criminal sanctions for its breach," the latter of which "is not a common characteristic" of disciplinary systems. 435 U.S. at 837.

Indeed, it's hard to characterize the Confidentiality Provisions as threatening "penalties" at all. Dismissing an allegation is exactly the kind of "internal procedure[ ] to protect the confidentiality of Commission proceedings" that *Landmark* suggested is lawful. 435 U.S. at 845. That internal procedure has no effect on a complainant's legal rights. And as for admonishing a complainant (or even reporting them to the Office of Lawyer Regulation, as IRG says it fears), that's pure speech by the Commission. A government entity "is entitled to say what it wishes" and "to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Criticizing a complainant like IRG for breaching confidentiality or even reporting such conduct to the Office of Lawyer Regulation falls within the Commission's right to "say what it wishes" about those who appear before it. *Id.*

### 3. There aren't any penalties for third parties.

Even if the Confidentiality Provisions could be construed as allowing "penalties," they're still narrowly tailored because they don't cover nonparticipants. Again, *Landmark* drew a clear line between penalties on "nonparticipants"

(especially the media) versus penalties on "participants." 435 U.S. at 839 n.10, 841 n.12, 845 n.13. Here, nonparticipants retain their full First Amendment rights to discuss "matters of utmost public concern," *id.* at 839, and so do participants, at least as to the underlying allegations of judicial misconduct. But when it comes to the Commission's processes, complainants like IRG voluntarily avail themselves of those processes and therefore must accept a corresponding limitation on their right to discuss them. That properly balances the interests at stake: the First Amendment interest in criticizing the judiciary and Wisconsin's interest in efficacious Commission proceedings that aren't weaponized against judges.

**4. Confidentiality ends upon a finding of probable cause.**

And the Confidentiality Provisions are narrowly tailored because they mirror the ones *Landmark* observed in most states: "confidentiality extends only to the point when a formal complaint is filed with the State Supreme Court or equivalent body." 435 U.S. at 834; *see* Wis. Stat. § 757.93(3). As the Third Circuit put it, "in judicial disciplinary proceedings, what tradition there is, favors public access only at a later stage in the process." *First Amend. Coal.*, 784 F.2d at 473. This balance "accommodate[s]" First Amendment interests "up to the point that the state has determined them to be outweighed by more compelling interests." *Id.* Again, most states and Congress have struck the same balance, which the ABA also recommends.

IRG doesn't seem to dispute that applying the Confidentiality Provisions during the Commission's investigative phase serves compelling interests. Indeed, IRG describes lifting confidentiality "once the Commission closes a matter without further action" (that is, after investigation) as a "balanced" solution, and it proposes

"temporary confidentiality during active investigation" and "pending cases" as a less restrictive alternative. (Dkt. 29-1:16.) That's an important concession, as it means the Confidentiality Provisions validly forbid a complainant from discussing the fact that it filed a complaint simultaneously with (or shortly after) filing, which IRG says it wanted to do here. The amicus here generally agrees. (Dkt. 33-1:20–21.)

The only disagreement appears to involve the period *after* the Commission dismisses a request for investigation for lack of probable cause, without filing a formal complaint. (Dkt. 29-1:15 (criticizing the "*perpetual* bar" on discussing Commission proceedings that have been dismissed); Dkt. 33-1:21–22 (amicus arguing similarly).) But "none of [the] authorities" that IRG cites "supports the conclusion that a bar on disclosure, even after the conclusion of the proceedings, is constitutionally infirm." *Adams*, 165 F. Supp. 3d at 929–30.

That's because maintaining confidentiality even after dismissal serves important state interests, despite *Kamasinski*'s cursory statement otherwise. *See* 44 F.3d at 112. As the American Bar Association explained in connection with its Model Rules (which operate similarly):

> Disclosing the existence of complaints that were considered and dismissed is unfair to the judge and undermines the work of the commission. It is unfair to allow any adverse inferences to be drawn from the mere existence of a complaint when it was not substantial enough to state a possible ground for discipline. The commission and disciplinary counsel will have greater credibility if they do not release information about dismissed complaints under any circumstances.[14]

[14] *Model Rules for Judicial Disciplinary Enforcement*, Am. Bar Ass'n (Aug. 13, 2018), http://americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/rule11/.

In other words, the judiciary's reputation remains at stake even after dismissal, when merely disclosing that "I filed a complaint about Judge X with the Commission" still likely gives allegations greater weight in the public eye.

And, perhaps more important, witnesses may be particularly disinclined to cooperate with an investigation if post-dismissal proceedings become public. (Van Hecke Decl. ¶¶ 8, 15.) Consider when the Commission does file a formal complaint—witness testimony against a judge becomes public, to be sure, but witnesses receive support from the Commission's effective endorsement of their testimony. By contrast, if witnesses are exposed to public view even when the Commission *doesn't* endorse their testimony through a formal complaint, they may be even less likely to cooperate with Commission investigations.

Again, most jurisdictions draw a similar line. The federal disciplinary system does and, at least as of 2000, "[m]ost states . . . make public the matter only after some level of probable cause findings"; Arkansas "[stood] alone in making public the results of all disciplinary complaints, whatever the conclusion." Mary Ellen Keith, *Judicial Discipline: Drawing the Line Between Confidentiality and Public Information*, 41 S. Tex. L. Rev. 1399, 1402 (2000).[15] That's consistent with the ABA's recommendation that "[i]f the complaint is dismissed without the filing of formal charges, the commission may never disclose it."[16]

---

[15] Since then, it appears that a few jurisdictions have loosened their rules a bit as to dismissed complaints, but the majority approach doesn't seem to have changed. *See* Cynthia Gray, *The Center for Judicial Ethics*, 96 Judicature 305, 308 (2013).

[16] *Model Rules for Judicial Disciplinary Enforcement*, Am. Bar Ass'n (Aug. 13, 2018), https://www.americanbar.org/groups/professional_responsibility/model_rules_judicial_disciplinary_enforcement/preface/.

### 5. IRG's proposed alternatives wouldn't work.

None of IRG's proposed alternatives would adequately protect the judiciary's reputation and the Commission's processes. (Dkt. 29-1:16.) First, IRG proposes a provision that only applies during the investigative stage, but that wouldn't address the continuing interest in confidentiality after dismissal. Second, IRG suggests a provision limited to the "Commission's own internal deliberations" (Dkt. 29-1:16), but that's not enough—disclosing the fact of a complaint and witnesses who participate in an investigation would harm the judiciary. Third, IRG cites other provisions that allow the Commission to speak in the event of a confidentiality breach (Dkt. 29-1:16 (citing Wis. Stat. § 757.93(2)), but by then the harm has already been done.

IRG also suggests that it wants to criticize the Commission for dismissing IRG's complaint here. (Dkt. 29-1:11–12.) And it has a point, to an extent, since "[t]he public has an interest in information about the conduct of its judiciary and consequently is entitled to assurance that the Board is properly discharging its duties." *First Amend. Coal.*, 784 F.2d at 473. But treating that as a categorical imperative under the First Amendment "without heed to the circumstances in which [it is] invoked would lead to an unjustifiably expansive interpretation." *Id.* IRG's supposed "right to know 'must be invoked with discrimination and temperance.'" *Id.* (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 588 (1980) (Brennan, J., concurring).) The proper balance here is the one Wisconsin (and many other jurisdictions) have struck.

### C. Any unconstitutional applications of the Confidentiality Provisions can and must be severed.

As shown above, IRG hasn't identified any invalid applications of the Confidentiality Provisions. But say they had, for instance, as to requiring confidentiality even after a complaint's dismissal. That wouldn't mean the Confidentiality Provisions should be facially invalidated, as IRG requests. Such a remedy is "not to be 'casually employed,'" given how it "destroys some good along with the bad." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation omitted).

Instead, the valid applications should be severed from the invalid ones. When a statute is unconstitutionally overbroad, courts must "assess whether the unconstitutional portion is severable," given how "[s]everance is a remedy that must be applied whenever possible." *United States v. Betts*, 99 F.4th 1048, 1054 (7th Cir. 2024). Put differently, the "'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328– 29 (2006) (citations omitted); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (noting option of "partial invalidation" that "narrows [a statute] as to remove the seeming threat or deterrence to constitutionally protected expression").

The Third Circuit in *First Amendment Coalition* took this approach to a challenged confidentiality provision. Although the court upheld a provision to the extent it denied a newspaper access to records of a disciplinary commission's proceedings, it rejected using the provision to prevent witnesses from "disclos[ing] the

substance of their testimony" given to the commission. *First Amend. Coal.*, 784 F.2d at 477, 479. Because the provision was "not totally invalid," the court held that it "may be enforced" in its valid applications. *Id.* at 479.

The same thing should happen here if, say, requiring confidentiality after the Commission dismisses a complaint is invalid. That would mean requiring confidentiality during the investigative stage is still constitutional, as IRG practically concedes and as the amicus here agrees. (Dkt. 33-1:20–21.) That's a "simple" line to draw, and it's practically self-evident that the Wisconsin Legislature "[w]ould . . . have preferred what is left of [the confidentiality provisions] to no statute at all." *Ayotte*, 546 U.S. at 329–30. Preserving confidentiality during the investigative stage but not after dismissals, although a problematic result as explained above, plainly would be better than having no confidentiality whatsoever. Indeed, striking down Wis. Stat. § 757.93 in full could expose even the Commission's internal deliberative and investigative processes to public view; it's hard to imagine how the Commission could continue operating at all in a world of full transparency. No other judicial disciplinary body in the nation works like that, and for good reason.

## II. The Confidentiality Provisions aren't unconstitutionally vague.

IRG alternatively contends that the Confidentiality Provisions are unconstitutionally vague. (Dkt. 29-1:17–18.) They aren't.

A law is void for vagueness only if it fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or invites "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But, even for laws regulating speech, "[p]erfect clarity and precise guidance

have never been required." *Smiley v. Jenner*, 173 F.4th 865, 871 (7th Cir. 2026). The law must simply have "an ascertainable core of meaning." *Id.* at 871–72. Moreover, there's "greater tolerance" of vagueness if a law carries "civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

Here, the Confidentiality Provisions provide sufficient notice of what conduct is prohibited, especially since they aren't even accompanied by civil, let alone criminal, penalties. The statute again provides that "[a]ll proceedings . . . relating to misconduct or permanent disability prior to the filing of a petition or formal complaint by the commission are confidential." Wis. Stat. § 757.93(1)(a); *see also* Wis. Admin. Code JC § 3.01 (similar). That plainly has an "ascertainable core of meaning," *Smiley*, 173 F.4th at 871: confidentiality covers anything directly tied to the Commission's processes of receiving complaints of judicial misconduct and considering and investigating them, unless and until the Commission files a formal complaint with the Wisconsin Supreme Court.

IRG professes confusion about whether the Confidentiality Provisions cover "communications about the filing of the Request for Investigation (including the substance of the Request)." (Dkt. 29-1:18.) But the substantive allegations—that is, the underlying facts—aren't covered because they aren't "proceedings" of the Commission. By contrast, the fact that IRG filed a complaint is covered, since that's what initiates the Commission's "proceedings" in the first place. Similarly, IRG complains that the provisions have "no clear time limit" (Dkt. 29-1:18), but their

temporal scope can be easily inferred. They apply "prior to the filing of a petition or formal complaint," Wis. Stat. § 757.93(1)(a), which necessarily means that if no such complaint is ever filed by the Commission, they last in perpetuity.

As for the Commission's catch-all power to "take other appropriate action" in response to a confidentiality breach under Wis. Admin. Code JC § 3.01, that term "should be understood in the same sense as the words immediately surrounding or coupled with it." *Benson v. City of Madison*, 2017 WI 65, ¶ 31, 376 Wis. 2d 35, 897 N.W.2d 16. The preceding references to the "dismissal" of a complaint or an "admonish[ment]" indicate that this phrase can only allow the Commission to use its own speech and existing administrative procedures to mitigate the harm of a breach. And, if nothing else, the phrase can't include criminal or civil penalties, again given the Commission's lack of statutory authority to impose them. In any event, IRG provides no authority holding that a "penalty" provision (as opposed to a substantive rule of conduct) can be challenged for vagueness. (Dkt. 29-1:19.) Vagueness doctrine ensures that "regulated parties should know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Similarly, laws "must provide explicit standards"—that is, standards of conduct—to prevent "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. This language doesn't tell anyone what to do.

## CONCLUSION

IRG's motion should be denied and the Commission's cross-motion granted.

Dated this 1st day of October 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

FAYE B. HIPSMAN
Assistant Attorney General
State Bar #1123933

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636 (CTR)
(608) 264-9487 (FBH)
(608) 294-2907 (Fax)
colin.roth@wisdoj.gov
faye.hipsman@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 1, 2026, I electronically filed Defendants' Memorandum of Law in Support of their Summary Judgment Motion and in Opposition to Plaintiff's Summary Judgment Motion with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

s/ Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985